**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:08CR371 |
| Plaintiff, | ) | |
| | ) | ORDER |
| vs. | ) | |
| | ) | and |
| ROLAND AWOUSSI and | ) | |
| MABEL AWOUSSI, | ) | REPORT AND |
| | ) | RECOMMENDATION |
| Defendants. | ) | |

This matter is before the court on the motion to sever (Filing No. 30) and the motion to suppress (Filing No. 34) filed by defendant Mabel Awoussi (Awoussi).[1]  Awoussi is charged in the Indictment with Roland Awoussi in a conspiracy to distribute and to possess with intent to distribute cocaine (Count I) in violation of 21 U.S.C. § 846 and with the possession with intent to distribute cocaine (Count IV) in violation of 21 U.S.C. § 841(a)(1). **See** Filing No. 2 - Indictment.  Roland Awoussi is also charged alone in Counts II and III with the distribution of cocaine in violation of 21 U.S.C. § 841(a)(1).

An evidentiary hearing was held on Awoussi's motions on February 4, 2009. Awoussi was present for the hearing along with her appointed counsel, Casey J. Quinn. The United States was represented by Assistant U.S. Attorney Thomas J. Kangior.  During the hearing, the court heard the testimony of Special Agents Paul Orduna (Agent Orduna), Sean Smotherman (Agent Smotherman), and Quinn D. Auten (Agent Auten) of the Drug Enforcement Administration (DEA), Kossi Adantor, and the defendant Awoussi.  The court also received into evidence a consent to search form (Exhibit 1), a photograph of some drugs and a safe (Exhibit 101), and a DEA report of investigation (Exhibit 102).  A transcript of the hearing (TR) was filed on February 9, 2009, whereupon the motion to suppress was deemed submitted (Filing No. 63).

---

[1]The defendant spells her name Mable, however since her name is spelled Mabel in the Indictment, the court will use that spelling here. **See** Filing No. 2 - Indictment; Filing No. 16 - Financial Aff.; Filing No. 30 - Ex. 2 Aff.

## FINDINGS OF FACT

Agent Orduna has been a DEA Special Agent for eighteen years (TR. 13).  Agent Orduna is primarily involved in drug investigations (TR. 14).  At 5:15 p.m., on October 16, 2008, Agent Orduna, along with other agents, went to Apartment 302, 4204 South 147th Plaza (TR. 14).  The apartment is situated with several other apartments in buildings laid out horizontally (TR. 14-15).  Access into the building is restricted to those allowed in by the residents by use of a buzzer system (TR. 15).  Prior to their arrival, the agents contacted Awoussi and told her they intended to return a set of car keys to her (TR. 15-16, 44).  The agents obtained the keys from Awoussi's brother in connection with his arrest earlier that day (TR. 16).  When the agents arrived and announced themselves, Awoussi activated the buzzer system to allow the agents to enter the building (TR. 16, 45).  Agent Orduna, who were wearing street clothes with a vest identifying him as DEA police and a concealed firearm, entered the building, with Agent Smotherman (TR. 16, 33-34).  Two additional agents entered the building but positioned themselves in the hallway nearby, but not within view of a person standing in the door of Apartment 302 (TR. 17).  These agents were nearby to offer assistance, if necessary, without intimidating Awoussi (TR. 17).

Agent Orduna knocked on the apartment door and Awoussi answered (TR. 17, 45-46).  Agent Orduna explained that Awoussi's brother had been arrested for drugs and the agents received car keys from him which belonged to Awoussi (TR. 17).  Agent Orduna then asked if he could come into the apartment (TR. 17).  Agent Orduna spoke to Awoussi in English and Awoussi responded in English (TR. 17-18).  Awoussi told the agents they could come in (TR. 18, 47).  Awoussi appeared concerned about her brother's status, but did not appear to be afraid of the agents (TR. 18, 60).  Agent Orduna asked Awoussi if the agents could look around the apartment to determine if there were any other people present (TR. 18).  Awoussi agreed to allow the agents to check the apartment for other people (TR. 18-19).

Agent Orduna remained with Awoussi to ask her questions while three other agents entered and conducted a protective sweep of the apartment with their weapons drawn (TR. 19, 37, 64).  The apartment had one bedroom, with a walk-in closet, one bathroom, a small kitchenette and a common living area (TR. 14).  No other persons or items of an

2

evidentiary nature were found (TR. 48).  During the brief sweep, Agent Orduna asked if the agents could search the apartment for drugs or other contraband (TR. 18).  Awoussi verbally agreed (TR. 19, 49).  While seated at the kitchen table, Agent Smotherman explained a consent to search form to Awoussi and asked her to sign it (TR. 19-20, 48-50, 65-66).  Awoussi signed the form giving her consent to search the apartment (TR. 50; Ex. 1).  During the time between the agents' entry into the apartment and the consent to search Awoussi did not ask the agents to leave, ask for an attorney, or express any difficulty understanding the questions posed (TR. 20, 26).  Awoussi did not express any questions about the consent to search form, but stated she understood the form (TR. 50).  Awoussi appeared very calm, relaxed, and cooperative (TR. 50, 87).

During the search, Awoussi remained in the living room with Agent Smotherman (TR. 21).  Agent Smotherman has been a DEA agent in Omaha since February 2006 and is generally involved in drug distribution cases (TR. 43).  Agent Smotherman asked Awoussi whether Roland Awoussi stayed at the apartment and other questions about him and their relationship (TR. 48, 51).  Agent Smotherman asked Awoussi about some financial matters including information about Roland Awoussi sending Awoussi money orders for her to pay credit card bills (TR. 53).  Awoussi was free to move about the apartment, and was not restrained or told she could not leave (TR. 21, 52).  The agents did not threaten Awoussi or make any promises to induce her consent to search (TR. 86-87).

Agent Orduna participated in the search of the apartment (TR. 20).  Agent Auten found 83 pellets, approximately 1,150 grams, of cocaine in two Pringles cans under a grocery bag in the bathroom trash box, which was under the bathroom sink (TR. 21, 51, 81, 83).  The small oval, almost egg-shaped, pellets were wrapped in tape and about two inches in length, the size to be swallowed and later excreted (TR. 42).  Agent Smotherman called Awoussi into the bathroom to show her the cocaine (TR. 22, 52-53).  Agent Smotherman asked Awoussi if she knew about the cocaine and she said she did not know what it was (TR. 53, 84).  Subsequently, Awoussi returned to the living room and/or kitchen area where she turned off a pot which was cooking (TR. 22, 52).  Awoussi did not attempt

to stop or curtail the search in any way (TR. 26).  At no time did Awoussi ask the agents to leave or ask for an attorney (TR. 27, 59).

After discovery of the cocaine, Special Agent Brent Fisher (Agent Fisher) found a safe on a shelf in a laundry area near the entry to the apartment (TR. 22, 54-55).  The safe was a Sentry-brand, portable, fireproof safe about twelve inches wide, six inches deep by four inches high, weighing ten pounds (TR. 42, 54).  Agent Fisher showed the safe to Awoussi (TR. 23).  Agent Smotherman asked Awoussi to whom did the safe belong and whether she had a key (TR. 23, 55).  Awoussi stated the safe belonged to her, but the key had been lost for approximately one year (TR. 23, 55).  The agents asked Awoussi about losing the key and told her they would take the safe to open it elsewhere (TR. 23).  Awoussi asked if the agents "really need to take the safe?" and stated "I would rather you did not take the safe" (TR. 56).  Awoussi said the safe was empty, was valuable and she did not want it to be damaged (TR. 23-24, 56).  Agents Orduna, Smotherman and Auten never heard Awoussi say the agents could not take or open the safe (TR. 24, 56, 85).  Agent Auten explained to Awoussi he would take the safe to his office where he could open it and look inside (TR. 86).  Agent Auten told Awoussi he would return the safe when he was done, if it was empty (TR. 25, 86).  Awoussi responded, "okay" (TR. 86).  Based on Awoussi's comments and conduct, the agents did not understand she meant to revoke her consent to search the safe (TR. 57).  The safe did not appear expensive (TR. 24).  Awoussi did not appear to have any difficulty understanding the questions about the safe, nor was she hesitant in her answers (TR. 26).  The agents took the safe when they left the apartment (TR. 24-25).  The search of the apartment concluded at 7:20 p.m. (TR. 41).  Awoussi was not advised of her *Miranda* rights during the search (TR. 59, 75).

The agents took the safe to the Omaha DEA office where Agent Auten pried the safe open with a wedge (TR. 25, 57, 87).  Agents Orduna and Auten do not believe the safe was damaged (TR. 25, 88).  The agents discovered 61 pellets of cocaine in the safe (TR. 25, 60).  Based on her statements regarding ownership of the safe, the agents returned to the apartment and took Awoussi into custody at approximately 9:30 p.m. (TR. 25, 80).  The agents did not interview Awoussi after her arrest (TR. 80).

Awoussi was born in Togo, Africa in 1974, and came to the United States in August 2000 (TR. 109).  Awoussi testified she has witnessed law enforcement officers in Togo beating students who were not doing anything wrong (TR. 110-112).  In Togo, Awoussi would not feel free to refuse any request made by law enforcement officers (TR. 112).  Awoussi believes that a refusal would result in Togo officers beating or killing a person (TR. 112).  Awoussi had never been arrested in Togo, or in the United States until October 16, 2008 (TR. 112).  Awoussi admits the agents knocked at her door, requested entry and she agreed to let them in (TR. 114-115).  Awoussi states she only let the agents in because she was afraid they would act like Togo officers and beat her, if she refused (TR. 115).  Awoussi described the agents who came to her door dressed with police insignia and stated one agent had his weapon in his hand, pointed toward the ground (TR. 116).  However, she did not see any weapons drawn after that (TR. 117, 138).  Awoussi admits she gave consent to search verbally and in writing, but states it was only because the agents were law enforcement (TR. 117-119).  Awoussi read the consent form, but denies Agent Smotherman read it to her (TR. 119).  Awoussi understood the form and reads and writes in English (TR. 135).  Awoussi did not feel free to leave when the agents were searching the apartment (TR. 120).  Awoussi stated she felt compelled to answer any questions posed to her by the authority figures (TR. 121).  At one point the agents were looking at her personal mail and she asked them not to look at the mail (TR. 136-137).  The agents complied (TR. 136, 142).  Awoussi testified she told the agents there was nothing in the safe and they did not need to take it, specifically telling them not to take the safe (TR. 122).  Awoussi's concern was that the safe would be broken, otherwise she did not care if the agents looked into the safe (TR. 123, 132).  She never told the officers they could not to look into the safe (TR. 132).  She let them take the safe after the agents said they would try not to break it (TR. 123, 133).  Awoussi testified the agents in her apartment did not verbally threaten her, were polite and explained everything to her (TR. 127).  However, she felt threaten by their presence and general show of authority (TR. 128, 130).

## LEGAL ANALYSIS

### I.   Motion to Sever

Awoussi seeks an order severing her trial from that of the co-defendant pursuant to Fed. R. Crim. P. 14(a), which provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Essentially, Awoussi argues she would be prejudiced by a joint trial because she would be denied her rights to present an individual defense and cross-examine another witness. More specifically, Awoussi states she intends to call her co-defendant as a witness on her behalf at trial.  Additionally, Awoussi intends to introduce statements made by Roland Awoussi, in which he makes incriminating statements about his involvement and exculpatory statements about Awoussi's involvement in the crimes charged.

At the time of the hearing in this matter, it appeared Awoussi's motion may be rendered moot by anticipated conduct of the co-defendant.  However, there has been no change in Roland Awoussi's plea to date.  In any event, the "court does not abuse its discretion in denying a motion to sever absent a 'firm representation' that a co-defendant would be willing to testify on the defendant's behalf."  *United States v. Crumley*, 528 F.3d 1053, 1063 (8th Cir. 2008) (**quoting** *United States v. Blaylock*, 421 F.3d 758, 767 (8th Cir. 2005)).  Awoussi seeks to have the court keep the motion to sever pending until such time as Roland Awoussi pleads guilty or verifies he will voluntarily take the stand in support of Awoussi (TR. 4-5).  Under the circumstances, the court will hold Awoussi's motion to sever in abeyance for a brief period giving counsel the opportunity to secure the necessary verification.

### II.   Motion to Suppress

#### A.   Entry

"In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent

circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 589-90 (1980) (citations omitted); **see *also* *United States v. Vance*, 53 F.3d 220, 221 (8th Cir. 1995)**.  "It is a well-established constitutional principle that law enforcement officers may not enter a person's home without a warrant unless the entry is justified by exigent circumstances or the consent of the occupant." *United States v. Conner*, 127 F.3d 663, 666 (8th Cir. 1997) (**citing *Steagald v. United States*, 451 U.S. 204, 211 (1981)**).  "[T]he 'touchstone of the Fourth Amendment is reasonableness.' Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (**citing *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)**).

Here, agents knocked on the door of the apartment and it was answered by Awoussi.  Awoussi had advance notice the agents were on their way and she buzzed them into the building.  After, Agent Orduna introduced himself and asked for permission to enter, Awoussi gave verbal consent to enter.  The agents acted reasonably under the circumstances by relying on Awoussi's consent to enter, despite any hidden or subjective concerns Awoussi may have had.  **See *United States v. Adams*, 346 F.3d 1165, 1170-71 (8th Cir. 2003)** (**quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)**).  Accordingly, the court finds no violation of the defendant's Fourth Amendment at the time of law enforcement's entry into the apartment.

## B.    Consent to Search

The Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *U.S. Const. amend. IV*; **see *United States v. Ameling*, 328 F.3d 443, 447 (8th Cir. 2003)** (Fourth Amendment applies to the states through the Fourteenth Amendment.).  "A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion." *United States v. Meza-Gonzalez*, 394 F.3d 587, 592 (8th Cir. 2005).  The Fourth Amendment test for valid consent to search is that the consent be voluntary, and such "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 40 (1996).  Some personal characteristics that aid in

7

determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests.  See *United States v. Comstock*, 531 F.3d 667, 676-77 (8th Cir. 2008) (listing factors).  A court may also look at environmental factors including, the period of time that the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the individual objected or stood by silently while the search occurred.  *Id.* (citing  *United States v. Saenz*, 474 F.3d 1132, 1137 (8th Cir. 2007)).

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (footnotes omitted). "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." *United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008).  The government bears the burden of proving voluntary consent to search by a preponderance of evidence. *United States v. Esquivel*, 507 F.3d 1154, 1159-60 (8th Cir. 2007).

The scope of a consensual search is measured by what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).  "The scope of a search is generally defined by its expressed object," but a person may limit the scope of a consensual search. *Id.* at 251-52.  The Fourth Amendment is not violated when "it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to open a particular container. . . ." *Id.* at 249.  In this case there is no evidence the consent to search was limited to exclude the safe, even though the search was limited to exclude other items of a personal nature.  The agents did not open any container for which consent to search was denied.  However, a reasonable person would not have understood the exchange between the agents and Awoussi to include destruction of property.  See *United States v.*

8

*Santana-Aguirre*, 537 F.3d 929, 932 (8th Cir. 2008) ("Consensual searches generally cannot be destructive."). In fact, Awoussi specifically stated she did not want the safe destroyed.

In the present case, no evidence suggests Awoussi was threatened, intimidated, or promised anything in return for giving consent to search the apartment or the safe. Awoussi voluntarily consented to the officer's search both verbally and in writing. Awoussi admits she understood the officers, who were polite, and the consent form. At all times, Awoussi appeared to understand what was going on, followed directions and otherwise responded appropriately to the agents. Awoussi's conduct led the investigators to reasonably believe Awoussi consented to the search of the apartment and safe, which she stated belonged to her. Although the agents did not specifically tell Awoussi that she had the right to refuse a search, the agents asked for permission to search, refrained from looking at Awoussi's personal mail when she asked them not to, and explained to her the reason and method for searching the safe. After the agents agreed to be careful with the safe, Awoussi gave her verbal consent for them to take the safe with them. The record clearly indicates Awoussi was concerned about the safe being damaged, rather than the agents looking into the safe. At no time did Awoussi revoke her consent for the agents to look into the safe. Although Awoussi did object to two aspects of the agents' search, Awoussi voluntarily granted permission to the agents to take the safe when they left her apartment. During the hearing, the court had an opportunity to observe the demeanor of three of the agents and Awoussi. Although the legal analysis is not dependant on a credibility determination, to the extent a credibility determination is needed the court finds the agents' credible. This determination is made based upon each of the witnesses' demeanor during the hearing, intelligence, memory, motives, general reasonableness and consistency with other testimony. Furthermore, although Awoussi testified she merely acquiesced to the agents' authority based on her own fears, the agents did not engage in any conduct to intimidate Awoussi, Awoussi understood the agents' actions, Awoussi gave her verbal and written consent to search, and Awoussi raised concerns with the agents during the search. The agents addressed Awoussi's concerns during the search by either complying with her request or explaining their intentions and obtaining additional verbal

9

consent to both look in and remove the safe.  The court finds Awoussi voluntarily gave consent for the officers to search the apartment and the safe.

### C.    Statements

Awoussi argues the statements she made to law enforcement while seated in her apartment should be suppressed.  There is no dispute Awoussi had not been given a *Miranda* warning prior to the statements.  The court must examine whether the statements were made pursuant to a custodial interrogation.

The Self-Incrimination Clause provides:  "No person ... shall be compelled in any criminal case to be a witness against himself."   U.S. Const. amend. V.   "[T]he core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial."  *United States v. Patane*, 542 U.S. 630, 637 (2004).

> [I]n *Miranda*, the Court concluded that the possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated.  To protect against this danger, the *Miranda* rule creates a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief.

*Patane*, 542 U.S. at 639 (**citing** *United States v. Dickerson*, 530 U.S. 428, 434-35 (2000); *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)).  "The requirements of *Miranda* arise only when a defendant is both in custody and being interrogated."  *United States v. Londondio*, 420 F.3d 777, 783 (8th Cir. 2005).

> Not every confession obtained absent the *Miranda* warnings is inadmissible, however, because "police officers are not required to administer *Miranda* warnings to everyone whom they question.  *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'  It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited."

*United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (*quoting* *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).  The "ultimate inquiry is simply whether there [was]

a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (internal marks omitted); **see** *United States v. Elzahabi*, 557 F.3d 879, 883 (8th Cir. 2009).  The court must evaluate the objective circumstances surrounding the interrogation, and whether, under those circumstances, "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  The Eighth Circuit has identified several factors, which act to mitigate or aggravate the custodial atmosphere, used to determined whether an interview is custodial, however "an explicit assertion that the person may end the encounter". . . "provides an individual with a clear understanding of his or her rights and generally removes any custodial trappings from the questioning." *United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006).  Some specific factors to evaluate are:

> 1.    whether the police told the suspect he was free to leave, was free to refuse to answer questions, or was not under arrest;
> 2.    whether the person's movements were unrestrained during the interview;
> 3.    whether the person either initiated contact with authorities or voluntarily acquiesced to official requests;
> 4.    whether the police used coercive or deceptive tactics that restricted the suspect's freedom to terminate the encounter; and
> 5.    whether the questioning occurred in a police-dominated atmosphere.

*Id.* at 1137.

Interrogation in the *Miranda* context refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (**quoting** *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).  The agents did ask questions of Awoussi which may have, and in some cases did, elicit incriminatory responses. Accordingly, the court finds Awoussi was subject to interrogation on October 16, 2008. However, *Miranda* requires both custody and interrogation.

Awoussi argues she did not feel free to leave during the search of her apartment. Specifically, Awoussi asserts she was subject to a custodial atmosphere by being

questioned in close quarters in the presence of multiple armed law enforcement officers. Additionally, Awoussi contends her background and experiences colored her subjective perception of the agents, making her able to leave or contradict the agents.  However, Awoussi was not restrained, arrested or the subject of the agents' interest during the majority of the interrogation.  Awoussi was in her own residence and free to move around. There is no evidence the agents used deceptive practices or coercion.  In fact, Awoussi admits they were polite and explained everything to her, which she understood.  While there were several officers present during the search, and more than one spoke to Awoussi, the agents were not focused on or hovering over her.  The primary questioning took place with one agent while the two were seated at a table.  Awoussi's observable conduct and demeanor did not alert the agents to any subjective fears she may have had. Based on the combined factors present, the court finds Awoussi was not in custody during her interrogation on October 16, 2008.  Therefore, the court concludes the officers were not constitutionally obligated to advise Awoussi of her *Miranda* rights.  Under the circumstances, the court finds Awoussi's October 16, 2008 statements were voluntarily given.  Upon consideration,

**IT IS ORDERED:**

Mabel Awoussi's motion to sever (Filing No. 30) is held in abeyance pending notification by Awoussi that the motion has been abandoned or further evidence is secured in support of the motion **on or before May 4, 2009**.

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Mabel Awoussi motion to suppress (Filing No. 34) be denied.

## ADMONITION

Pursuant to NECrimR 57.2 and 57.3  any appeal of this Order or objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Order and Report and Recommendation.  Failure to timely appeal or object may constitute a waiver of any appeal

or objection.  The brief in support of any appeal or objection shall be filed at the time of filing such appeal or objection.  Failure to file a brief may be deemed an abandonment of the appeal or objection.

DATED this 3rd day of April, 2009.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge

13